UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ELDON D. VAN ANKEN,

                  Plaintiff,

v.                                         Case No.  5:07-cv-305-Oc-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                  Defendant.
_____

## ORDER

      Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits. (Doc. 1.)  The Commissioner has answered (Doc. 7) and both parties have filed briefs outlining their respective positions.  (Docs. 12 & 13.)  For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

      On October 28, 1999, Plaintiff filed an application for disability insurance benefits claiming a disability onset date of December 2, 1997. (R. 46-48.)  The application was denied initially and upon reconsideration. (R. 40-41, 43-44.)  Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ").  (R. 39.)  After conducting a hearing on June 20, 2001, (R. 207-229) the ALJ issued a decision unfavorable to Plaintiff on July 31, 2001. (R. 9-20.)   Plaintiff timely filed a request for review with the Appeals Council.  (R. 5.) The Appeals Council denied Plaintiff's request for review.  (R.

3.)  After having exhausted his administrative remedies, Plaintiff sought judicial review

pursuant to 42 U.S.C. § 405(g).  On September 26, 2002, this Court remanded

Plaintiff's claim to the Commissioner for further adjudication.[1]

Accordingly, the Appeals Council remanded the case to an ALJ on February 20,

2003.  (R. 274.)  Following supplemental proceedings, the ALJ issued a new decision,

again denying Plaintiff's claim, on July 23, 2003.  (R. 262.)  The Appeals Council

assumed jurisdiction, and on October 18, 2006, remanded the case to a different ALJ

with instructions to obtain testimony from a medical expert.  (R. 260-265.)  Pursuant to

this order, a hearing was held at which a medical expert testified.  (R. 442-476.)  On

May 17, 2007, the ALJ issued her decision, again denying Plaintiff's claim.  (R. 233-

246.)  The Appeals Council declined to exercise jurisdiction and on June 5, 2007,

Plaintiff filed her appeal to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[2]  Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the

---

[1]  (R. 267-270); *See* <u>Van Anken v. Commissioner</u>, No. 5:02-cv-39-OC-GRJ (M.D. Fla. Sept. 26, 2002).

[2]  *See* 42 U.S.C. § 405(g).

[3]  <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401, (1971); <u>Walden v. Schweiker</u>, *accord* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

2

district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7]   The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9]   First, if a

---

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[6] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

claimant is working at a substantial gainful activity, she is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, she is disabled.[12] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[13] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC'), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the grids

---

[10] 20 C.F.R. § 404.1520(b).

[11] Id. at § 404.1520(c).

[12] Id. at § 404.1520(d).

[13] Id. at § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty, 245 F.3d at 1278 n.2. In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations. Id. (citations omitted).

for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[18] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

---

[17] Walker, 826 F.2d at 1002 "[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[18] Phillips v. Barnhart, 357 F.3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)("[T]he grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[19] Walker, 826 F.2d at 1003.

[20] Wolfe, 86 F.3d at 1077-78.

[21] See id.

[22] See Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

## III.  SUMMARY OF THE RECORD EVIDENCE

Plaintiff was 48 years old at the time his disability insured status expired on June 30, 2000.  (R. 45-46, 307-308.)  Plaintiff has a high school education and past relevant work as an auto maintenance technician and maintenance worker on a horse farm.  (R. 76, 450.)  Plaintiff contends that he has been unable to work since December 2, 1997, due to fibromyalgia and chronic fatigue syndrome.  (R. 75, 211.)  Plaintiff has additionally alleged a disabling mental impairment.  (R. 460.)

Plaintiff has a history of laser excision of a urethral condyloma in 1994 and he has undergone follow-up testing which has shown no recurrence of urethral obstruction.  (R. 140.)  On September 21, 1998, Plaintiff had a colonoscopy that revealed a small polyp.  (R. 129.)  At this time, Plaintiff stated that he did not take any regular prescription medications.  (R. 132.)   During the musculoskeletal examination, there was no evidence of muscle wasting, swelling or erythema of joints.  (R. 133.)

On October 22, 1998, Plaintiff was seen at the Shands Clinic for abdominal pain.  (R. 98.)  A colonoscopy revealed a small polyp.  A CT scan and ultrasound demonstrated a complex left renal cyst.  Plaintiff underwent an exploratory operation and cyst marsupialization.  (R. 96-100.)  While being treated for the abdominal pain, Plaintiff stated that  he occasionally takes anti-inflammatory medication for his pain, and otherwise, he is quite healthy.  (R. 109.)

On August 25, 1999, Plaintiff was referred to Dr. Mark Mishkind, for lower quadrant abdominal pain despite courses of antibiotics for presumed diverticulitis.  (R. 128.)  Plaintiff complained of pain throughout his joints, dizziness, ringing in his ears and problems with irritable bowl syndrome.  Dr. Mishkind responded to Plaintiff's

suggestion that he has fibromyalgia by stating "[f]ibromyalgia is less common in men, but he may have something along that line with all the somatic complaints he has." (R. 128.) Dr. Mishkind referred Plaintiff to a rheumatologist or a chronic pain doctor.

Plaintiff underwent a consultative physical examination with Dr. Medero on February 23, 2000. (R. 150-153.) During that evaluation, Plaintiff complained of fibromyalgia and chronic fatigue syndrome. Dr. Medero noted that Plaintiff's range of motion of the cervical spine was normal and full with pain at the ends of the motion. (R. 151.) During a musculoskeletal examination, Dr. Medero noted that there was no swelling or deformity. (R. 152.) According to Dr. Medero, Plaintiff had tenderness along the spine, especially at T-4, T-5, and L-3, but otherwise Plaintiff had a normal spinal examination. Dr. Medero further found a full range of motion of the cervical and thoracolumbar spines, with a normal gait, and a negative straight leg raising both seated and supine. (R. 153.) Dr. Medero noted that Plaintiff did not require an assistive device; he had normal grip strength and fine manipulations, and there were no deformities, heat, redness, swelling, pain, tenderness, or other signs of inflammation. Lastly, Dr. Medero concluded that Plaintiff had normal sensory, motor and reflex findings and normal repetitive muscle testing of the upper and lower extremities.

Beginning June of 1999, Plaintiff was treated at Family First Medical Center. (R. 165-180.) During this time frame, the diagnostic impressions were, fibromyalgia, chronic fatigue syndrome, obesity, and depression. (R. 166-169.) However, the notes disclose that in February of 2000, Plaintiff had full range of motion of the lumbosacral spine with no evidence of tenderness or deformity. (R. 166.)

Plaintiff began his treatment with a pain specialist, Dr. Mangala Shetty on April

7

27, 2000.  (R. 164.)   During the initial evaluation, Plaintiff complained of a five year history of low back pain radiating to his right lower extremity and a three year history of left lower quadrant pain with occasional generalized fatigue and intermittent body pain. (R. 162.)  Additionally, Plaintiff stated that he had bilateral shoulder and hand pain and occasional numbness in his thigh and calf, as well as, sleep difficulties.  Plaintiff stated that his pain is aggravated by activity and is relieved by sitting or stretching.

On examination, Dr. Shetty noted that Plaintiff had a normal c-spine flexion, extension, and lateral rotation.  (R. 163.)  However, Plaintiff had significant tenderness over the spinous process of (T-9), (T-10) and (T-11), and in the lumbar area (L-3) through (L-5) with moderate right paravertebral tenderness.  Dr. Shetty further noted that Plaintiff had significant tenderness over the right-sided posterior superior iliac spine with positive straight leg raising on the right at nearly 80 degrees.  Plaintiff had normal motor strength in all muscle groups and intact sensation to pinprick throughout.

In his assessment, Dr. Shetty concluded that Plaintiff had generalized body pain, chronic fatigue syndrome, thoracic and lumbar pain, right sided sacroiliac joint dysfunction and chronic back pain, with no objective evidence of radiculopathy.  (R. 164.)  Dr. Shetty prescribed conservative treatment, such as, aquatic therapy in conjunction with a low dose of Oxycontin with Ultram, for breakthrough pain, and Baclofen to relieve muscle spasms. (R. 197.)

During a follow up examination in November of 2000, Plaintiff had significant tenderness to palpation of the thoracic spine with severe muscle spasms in the paravertebral area and the thoracic spine.  (R. 196.)  Dr. Shetty noted that Plaintiff had chronic back pain with a right lower extremity radiculopathy.  Dr. Shetty states that a

8

recent MRI did show a fairly large herniated disk, to the right paracentral area at (L-4) to (L-5).  According to Dr. Shetty, Plaintiff had two lumbar steroid injections with partial improvement of his radicular symptoms.  (R. 392.)  Dr. Shetty diagnosed fibromyalgia with significant generalized myofascial pain, with recent exacerbation.

In June of 2001, Dr. Shetty assessed Plaintiff's condition as fibromyalgia and significant myofascial pain.  (R. 203-206.)  According to Dr. Shetty, Plaintiff had 14 of 18 tender points on examination, chronic lower back pain with a right lower extremity radiculopathy, chronic fatigue syndrome, and right sided sacroiliac joint dysfunction.  Dr. Shetty opined that Plaintiff was restricted to lifting and carrying 10 to 20 pounds. Plaintiff could stand or walk approximately two hours in an eight hour workday, alternating sitting and standing periodically.  (R. 205.)  Plaintiff's ability to push or pull with his lower extremities  was decreased due to fibromyalgia and lumbar degenerative disc disease, with frequent exacerbation of symptoms.  Dr. Shetty further stated that Plaintiff was restricted from climbing, balancing, or crawling but that he could kneel or crouch occasionally.  Dr. Shetty noted that Plaintiff had unlimited use of his upper extremities with respect to reaching (including overhead reaching), handling, fingering, or feeling.

Dr. Alfredo Jacome, a consultative examining neurologist, examined Plaintiff on February 19, 2001.  (R. 200.)  Electrophysiological findings showed no evidence of left median nerve entrapment neuropathy, nor a cervical or lumbar motor neuronopathy, nor any evidence of diffuse peripheral neuropathy.

A cervical MRI was completed in March of 2001, which showed very mild posterior disc bulges at (C-4) to (C-5), (C-5) to (C-6), and (C-6) to (C-7) with only

minimal narrowing of the spinal canal and no evidence of disc herniation.  (R. 198.)  On this same date, an MRI of the lumbar spine was performed and compared to the previous MRI study of June 28, 2000.  The MRI findings disclose that the previously seen disc herniation at (L-4) to (L-5) was no longer evident.  Additionally, there  was no evidence of a disc herniation nor spinal or neuroforaminal stenosis at any level.

In January of 2002, Plaintiff underwent neuropsychological screening.  (R. 413.)  Plaintiff was able to maintain his concentration, his recall for remote and recent events appeared accurate, he was not easily fatigued and he had normal intellectual functioning.  (R. 415.)  Dr. Abraham Spevack, a psychologist, suggested that Plaintiff's response indicated a concern with his somatic difficulties which may be exacerbated when under stress.  Dr. Spevack also noted that Plaintiff did not view himself as depressed or anxious but plagued by somatic difficulties that he does not associate with stress.  Dr. Spevack suggested that stress reduction might reduce Plaintiff's physical distress.

Plaintiff has testified at three administrative hearings.  The first one was held on June 20, 2001.  (R. 207-229.)  During that hearing, the Plaintiff stated that he has headaches everyday which he medicates with Ibuprofen.  (R. 214.)  Plaintiff stated that the fibromyalgia caused his sinuses to burn and that he suffered from cramps in his legs, back, and side, when he was standing or sitting.  (R. 215, 217.)  Plaintiff estimated that his ability to walk and stand was limited to "five, ten minutes" and when he exceeded that time frame he experienced muscle tremors and cramps.  (R. 217.)  Plaintiff testified that his back "provides a great deal of pain" and that the pain radiated down into his hips.  (R. 218.)  Additionally, Plaintiff testified that the front side of his right

10

leg was numb down to his knee and that he had involuntary muscle movements.  (R. 219, 221.)

Plaintiff estimated that he could lift five to ten pounds.  (R. 218.) By his account, Plaintiff was able to rake the leaves, mow the lawn, feed his dogs and care for his personal needs.  (R. 216, 220.)  However, he stated that after this morning routine he must lay down due to exhaustion.  Plaintiff was able to shop with his wife and to eat lunch out.  (R. 226.)  Plaintiff estimated that these problems began when he was in the military.  (R. 223.)  However, he stated that in the last six months his condition has worsened.  Plaintiff testified that he is unable to sleep and when he woke up, he felt exhausted.  (R. 225.)  Bending at the waist caused dizziness and extreme pain and he would rate his fatigue on a severity scale as an eight to ten everyday.  (R. 226-227.)

Plaintiff testified at the second administrative hearing which was held on June 19, 2003.  (R. 477-516.)  Plaintiff stated that his work in the U.S. Army involved supervisory duties and frequently lifting weights up to 100 pounds.  (R. 486.)  Within the last 5 years, Plaintiff stated that he has applied for jobs through the unemployment office and he registered for college course work.  (R. 488-489.)  Plaintiff testified that physical therapy did not help his pain which he describes as in his shoulders, lower back and hips.  (R. 490- 491.)

According to Plaintiff, the medications, Paxil, Buspar, Xynoflex, Oxycontin, Claritin, Dextro and Viagara, were very helpful to him and improved his condition.  (R. 494-495.)   Heating pads and stretching also help the symptoms.  (R. 500.)  During this time frame, Plaintiff described his pain as ranging from a three to a four to an eight or nine on a zero to ten scale.  (R. 505.)

11

During the course of this hearing, Plaintiff recalled his activities of daily living.  (R. 497.)  This included mowing and weeding the lawn once a week as well as washing dishes, vacuuming, and mopping.  Additionally, Plaintiff stated that is able to wash his car once a month and change the oil.  (R. 499.)  Plaintiff was able to walk a quarter of a mile and accompanied his wife shopping.  (R. 498.)

Plaintiff testified at the third administrative hearing held on January 30, 2007.  (R. 442-476.)  Plaintiff testified that he was in the Army from 1974 to 1994 and that he retired in 1994.  (R. 450, 484.)  While in the Army, Plaintiff was a maintenance technician.  In addition to his Veterans Administration retirement benefits, he receives a 40% veteran disability compensation based upon his feet and wrists.  (R. 451.)  Specifically, he suffers from Morton's neuromas.

During this hearing, Plaintiff's complaints included muscle pain in his calves, thighs, back, and shoulders.  Additionally, he stated that he suffered from head aches, joint pain, and exhaustion.  Although he is able to conduct his daily activities, he testified that he is usually limited to 30 to 45 minutes of activity and then he must take a break due to exhaustion.  (R. 452.)  According to the Plaintiff, the breaks last for 30 to 45 minutes.

 Plaintiff stated that he was able to work until 1997 because his job was next door to his own home.  (R. 455.)  Plaintiff testified that he spent the day alternating sitting, standing, and lying down.  (R. 454.)  Plaintiff estimates that his time period of actual productive work is approximately two to three hours.  (R. 456.)  Plaintiff stated that concentration problems prevented him from troubleshooting at the mechanic job.  (R. 456-458.)  Because he becomes confused and regularly falls asleep while driving,

Plaintiff stated that he no longer drives.  (R. 449.)  However, Plaintiff acknowledges that

he is able to vacuum, mop (R. 455), rake leaves, pick up sticks in the yard, weed and

mow the lawn. (R. 455.)

Plaintiff testified that he took Oxycontin to lessen the pain, muscle relaxers for

muscle spasms and tremors, Paxil for depression and Ibuprofen for headaches.  (R.

453-456, 458-459.)  Additionally, Plaintiff stated that he received two steroid injections,

which he claims did not help his condition. (R. 453.)

Plaintiff stated that he has never been hospitalized for mental impairments (R.

460) but that he does receive treatment by a psychologist or psychiatrist at the Veterans

Administration hospital.  (R. 461.)  However, he was unable to remember the name of

the treatment provider.  Because he was prideful, Plaintiff explained that he did not

mention his mental impairments previously.

The ALJ determined that Plaintiff suffers from complaints of generalized body

pain, thoracic and lumbar spine pain with no evidence of radiculopathy, right-sided

sacroiliac joint dysfunction, possible fibromyalgia or chronic fatigue syndrome, obesity,

gastroesophageal reflux disease, peptic ulcer disease, degenerative joint disease, and

episodes of rhinitis.[23]  (R. 242.)  While these impairments are severe, the ALJ

determined that Plaintiff did not have an impairment or combination of impairments

which met or medically equaled one of the impairments listed in Appendix 1, Subpart P

of Social Security Regulation No. 4.   (R. 243.)  Specifically, the ALJ found that the

---

[23]  The ALJ also noted Plaintiff's history of partial nephrectomy of a left renal wall cyst, Morton's neuromas of both feet, plantar fascitis, urethral condyloma, and status-post trananal excision of rectal polyps.  (R. 242.)

objective medical evidence fails to establish that Plaintiff has a Somatoform disorder and that Plaintiff's condition did not exist before the age of 30 years of age, as is required in Section 12.07 of the Listings of Impairments.  The ALJ also found that the underlying components of  Sections 1.02 (for feet) and 1.04 (for back) were not addressed and therefore the Plaintiff failed to meet the criteria of Section 1.02 and 1.04 of the Listings of Impairments.

Further, the ALJ found that Plaintiff retains the RFC to sit from six to eight hours in an eight hour workday and stand or walk for a total of two hours in the same time period, alternating sitting and standing within scheduled breaks and a lunch period.  (R. 243.)  According to the ALJ, Plaintiff could lift 10 to 20 pounds and he could perform simple, repetitive tasks that do not require substantial judgment.  The ALJ then determined that although Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, she did not find Plaintiff's statements concerning the intensity, duration and limiting effects of these symptoms entirely credible.  (R. 244.)  However, the ALJ did determine that Plaintiff was unable to perform his past relevant work as an automotive maintenance technician or as a maintenance worker on a horse farm.  (R. 245.)

The ALJ concluded that Plaintiff had the physical RFC to perform less than a full range of sedentary work activities.  The ALJ used Rule 201.21 and 202.22 of the Medical-Vocational Guidelines (the "grids")[24] as a "framework" and found that considering his age, education, and work history Plaintiff was not disabled.  (R. 245.)

---

[24] 20 C.F.R. §404 subpt. P, app. 2, R. 201.21 & 202.22.

However, the ALJ then determined that Plaintiff's ability to perform all or substantially all of the requirements of this level of work may be impeded by Plaintiff's "alleged somatic preoccupations with pain and other limitations." (R. 246.) To determine the extent that these limitations may effect Plaintiff's ability to perform work, the ALJ enlisted a vocational expert ("VE") to determine whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC.

Susanna Roche, a VE, testified in response to three hypothetical questions posed during the administrative hearing. (R. 472-475.) The first hypothetical involved: (1) a worker between the ages of 45 and 48; (2) the education and past relevant work of the Plaintiff; (3) the ability to sit for six hours in an eight hour workday; (4) the ability to stand and walk for two hours in an eight hour day; (5) the individual must alternate sitting and standing; and (6) the ability to lift 10 pounds frequently and 20 pounds occasionally. (R. 474.) Based upon this hypothetical, the VE opined that Plaintiff could not perform his past relevant work.

However, the VE then stated that Plaintiff could perform other unskilled sedentary positions, specifically, DOT 209.567-014 and that there were 909 of these jobs statewide and 17,174 jobs nationally. (R. 474.) Additionally, the VE opined that Plaintiff could perform the position of charge account clerk, DOT 205.367-014, with 38,367 jobs nationwide and 2,267 jobs in Florida. Lastly, the VE stated that Plaintiff could also perform the job as call out operator, DOT 237.367-014, with 11,000 jobs nationally and 705 jobs in the State of Florida.

The ALJ then modified the hypothetical to include a mental limitation which would limit Plaintiff to the ability to perform simple, routine, repetitive tasks. (R. 475.)

The VE concluded that this modification would not change the ability of Plaintiff to perform other work.  The third and final hypothetical included the limitation of fatigue and the necessity to take additional rest breaks.  (R. 475.) With this modification, the VE testified that this limitation would eliminate the ability of Plaintiff to perform other work.

Based upon the testimony of the VE and considering the Plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined that Plaintiff is not disabled because he is able to perform other work that exists in significant numbers in the national economy.  (R. 246.)  Finally, the ALJ concluded that Plaintiff was not disabled at any time from December 2, 1997 through June 30, 2000, that date Plaintiff was last insured.[25]  (R. 246.)

## IV.  DISCUSSION

Plaintiff raises two issues on appeal. First, Plaintiff argues that the ALJ erred by ignoring the testimony of the medical expert when the ALJ found that Plaintiff did not meet or equal a listing.  Second, Plaintiff asserts that the ALJ violated the pain standard by not accepting Plaintiff's complaints as credible.

## A.    The ALJ Did Not Err At Step Three By Finding That Plaintiff Failed To Meet Listings 12.07, 1.02 and 1.04

The Court will first turn to Plaintiff's argument that the ALJ erred by ignoring the testimony of the medical expert who found that Plaintiff's medical condition met or medically equaled a listing.  The ALJ determined that Plaintiff's impairments did not meet

---

[25]  To be eligible for disability insurance benefits under Title II of the Social Security Act, Plaintiff must establish that his disability began before his insured status expired.  42 U.S.C. § 423(a) and (c), 20 C.F.R. § 404.101, § 404.130, § 404.131; Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002).  The record demonstrates that Plaintiff's insured status expired on June 30, 2000.  (R. 307-308).  Consequently, Plaintiff must establish disability prior to that date.

or medically equal a listing.  (R. 239.)  Plaintiff contends that he meets or medically equals the criteria for Listings 12.07 Somatoform disorders,[26] 1.02 major dysfunction of joint(s),[27] and 1.04 disorders of the spine[28] and that the ALJ erred when he ignored the medical expert testimony that Plaintiff met or equaled these listings.  The Court does not agree.

The listings include medical criteria for specified disorders of thirteen major body systems.[29]  These impairments are so severe that an individual who has a listed impairment is generally considered unable to work based upon medical considerations alone.[30]  A claimant may prove that he is disabled by either (1) meeting the listings; or (2) equaling the listings.[31]  In order to meet a listing, the claimant must (1) have a diagnosed condition that is included in the listings; and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable listing and the duration requirement.[32]  A diagnosis alone is insufficient.[33]  In this Circuit, a plaintiff must present specific findings that meet the various tests listed under the applicable listing.[34]

---

[26]  20 C.F.R. § 404, Subpt. P, app.1, 12.07.

[27]  Id. at 1.02.

[28]  Id. at 1.04.

[29]  Wilkinson v. Bowen, 847 F.2d 660, 662 (11th Cir. 1987).

[30]  Id; (citing 20 C.F.R. § 416.925(a)).

[31]  Id.

[32]  Id; (citing 20 C.F.R. § 416.925(c)-(d)).

[33]  Id.

[34]  See Bell v. Bowen, 796 F.2d at 1350, 1353 (11th Cir. 1986).

Mere diagnosis of a listed impairment is not enough as the record must contain corroborative medical evidence supported by clinical and laboratory findings.[35]

In order to equal a listing, the medical findings must be at least equal in severity and duration to the listed findings.[36]  If a claimant has more than one impairment and none of his impairments meet or equal a listed impairment, the ALJ reviews the impairments, symptoms, signs, and laboratory findings to determine whether the combination of impairments is medically equal to any listed impairment.[37]  When deciding medical equivalence, the ALJ must consider the medical opinion of one of more designated physicians on an advisory basis.[38]  However, at this stage of the evaluation process, the burden is on the Plaintiff to prove that he or she is disabled and the Plaintiff must present evidence which describes how the impairment has such an equivalency.[39]

Plaintiff failed to satisfy his burden of proving that he meet all of the requirements of the listed impairments.  Section 12.07 applies to "[s]omatoform disorders: physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."[40]  In order for an impairment to meet the listing, the following criteria must be satisfied:

A.  Medically documented by evidence of one of the following:

---

[35] *See* Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[36] Wilkinson, 847 F.2d at 660, 662 (11th Cir. 1987).

[37] 20 C.F.R. § 416.926(a).

[38] Id. § 416.926(b).

[39] *See* Bell v. Bowen, 796 F.2d 1350, 1352-1353 (11th Cir. 1986); Wilkinson, 847 F.2d at  663.

[40] 20 C.F.R. §404, subpt. P, app.1, 12.07.

1.  A history of multiple physical symptoms of several years
duration, beginning before age 30, that have caused the
individual to take medication frequently, see a physician often
and alter life patterns significantly;

* * * * *

AND

B.  Resulting in at least two of the following :

1.  marked restriction of activities of daily living; and

* * * * *

3.  marked difficulties in maintaining concentration,
persistence, or pace.[41]

Plaintiff points out that Dr. Robert Salzman the medical expert who testified at the
hearing, opined that Plaintiff meets or equals the Section 12.07 listing.  Dr. Salzman
based this opinion on "various documents during that period of time."  (R. 467-468.)  Dr.
Salzman testified that he believed Plaintiff and that he has something seriously wrong
with him.  (R. 470.)

By its plain terms Section 12.07 is met only if the symptoms from fibromyalgia or
chronic fatigue syndrome began before Plaintiff turned 30 years of age.  Plaintiff failed to
establish the subsection A(1) criteria because there was no evidence that Plaintiff
experienced the symptoms of fibromyalgia before the age of 30.  Plaintiff turned 30 years
of age in 1982 and therefore was required to establish that his symptoms began before
then. In addition to establishing that his history of multiple symptoms began before age
30, Plaintiff was required to establish that the multiple physical symptoms that

---

[41]  20 C.F.R. §404, subpt. P, app.1, 12.07.

manifested before age 30, continued for several years duration. Notably, the record disclosed that from 1985 until 1994 Plaintiff was gainfully employed with the United States Army. (R. 450.)  Moreover, Plaintiff testified that he estimates that his "generalized aching in [the] muscles described as dull aching and throughout whole body...with cramps in arms and legs and involuntary muscle spasms in arms/legs all started in 1994." (R. 416.)  Lastly, the record discloses that Plaintiff was not diagnosed with fibromyalgia and chronic fatigue syndrome until 1999. (R. 416.)

In addition to failing to satisfy the criteria under A.1. of Listing 12.07, Plaintiff failed to satisfy the requirements under subsection B(3) of Listing 12.07 because there is no evidence that Plaintiff had marked limitations in concentration, persistence or pace. Although Plaintiff testified that his concentration and memory function were impaired, this assertion was not supported by the psychological testing which found no evidence of working memory or processing speed difficulties and which evidenced that Plaintiff's cognitive domains including memory, visuospatial, language, reasoning, attention/concentration were well within normal limits. (R. 415.)

Furthermore, the evidence did not show that Plaintiff has marked restrictions in his activities of daily living. To the contrary, during the relevant time frame, Plaintiff testified that he was able to shop with his wife and to eat out (R. 226), able to rake leaves, mow and weed the lawn (R. 216), feed his dogs, and care for his personal needs. (R. 220.)  Additionally, Plaintiff testified that he could wash dishes, vacuum, and mop (R. 497) and wash his car once a month and change the oil. (R. 499.)

Accordingly, for these reasons, the ALJ did not err in finding that Plaintiff's impairments failed to meet Listing 12.07 and the ALJ's conclusion was supported by the

20

substantial evidence of record.

The ALJ also did not err in concluding that Plaintiff's impairments failed to satisfy

the criteria for meeting or medically equally Listing 1.02 . Listing 1.02 applies to a major

dysfunction of a joint.  To meet this listing, an impairment must satisfy the following

criteria:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross
> anatomical deformity (e.g. subluxation, contracture,  bony or fibrous ankylosis,
> instability) and chronic joint pain and stiffness with signs of limitation of motion or
> other abnormal motion of the affected joints(s), and findings on appropriate
> medically acceptable imaging of joint space narrowing, bony destruction, or
> ankylosis of the affected joint(s).

> With:

> A.    Involvement of one major peripheral weight-bearing joint (i.e., hip,
> knee, or ankle) resulting in inability to ambulate effectively, as
> defined in 1.00(B)(2)(b).[42]

The "inability to ambulate effectively means an extreme limitation of the ability to

walk: i.e., an impairment that interferes very seriously with the individual's ability to

independently initiate, sustain, or complete activities."[43]  Examples of ineffective

ambulation include, the inability to walk without the use of a walker, two crutches or two

canes, the inability to walk a block at a reasonable pace, or the inability to carry out

routine ambulatory practices, such as shopping.[44]

The only evidence relevant to whether Plaintiff met this listing consists of Dr.

Salzman's statement that  "he has trouble standing for a period of time, nothing terrible,

---

[42]  20 C.F.R. §404, subpt. P, app.1, 1.02.

[43]  20 C.F.R. §404, subpt. P, app.1, 1.00(B)(1).

[44]  20 C.F.R. §404, subpt. P, app.1, 1.00(B)(2)(b).

but it was there." (R. 471.)  The ALJ rejected this testimony noting that the specific

underlying components of 1.02 were not addressed by Dr. Salzman.  (R. 243.)

Moreover, there is no evidence in the record which supports a finding that Plaintiff is

unable to ambulate effectively.  The medical evidence discloses that Plaintiff's gait is

normal and that Plaintiff was never required to use assistive devices, such as a cane,

walker or crutches.  (R. 153.)  Furthermore, in addition to his activities of daily living

which were described earlier, Plaintiff is able to shop with his wife and Plaintiff testified

that he can walk a quarter of a mile.  (R. 498.)  Accordingly, for these reasons, there is

simply no evidence that Plaintiff met the criteria of the Listing 1.02.

     Lastly, with regard to Listing 1.04, this listing applies to disorders of the spine.  To

meet this listing, an impairment must satisfy the following criteria:

> 1.04    Disorders of the spine (e.g., herniated nucleus polposus, spinal
>           anachnoiditis, spinal stenosis, osteoarthritis, degenerative disc
>           disease, facet arthritis, vertebral fracture), resulting in compromise of a
>           nerve root (including the cauda equina) or the spinal cord.
>
>         With:
>
>    A.    Evidence of nerve root compression characterized by neuro-
>           anatomic distribution of pain, limitation of motion of the spine, motor
>           loss (atrophy with associated muscle weakness of muscle
>           weakness) accompanied by sensory or reflex loss and, if there is
>           involvement of the lower back, positive straight-leg raising test
>           (sitting and supine).[45]

     Dr. Salzman's comment that Plaintiff met Listing 1.04 was based upon Dr.

Salzman's consideration of Plaintiff's back pain and all of Plaintiff's impairments for this

period of time. (R. 470.)  However, as correctly noted by the ALJ, Dr. Salzman did not

---

[45] 20 C.F.R. §404, subpt. P, app.1, 1.04.

conduct a more specific analysis of the requirements of 1.04.  Moreover, an MRI of Plaintiff's lumbar spine demonstrated that the previous disc herniation at (L-4) to (L-5) was no longer evident and that there was no evidence of a disc herniation nor spinal or neuroforaminal stenosis at any level. (R. 198.) Furthermore, in Dr. Medero's evaluation, Plaintiff had a full range of motion of the cervical and thoracolumbar spines, a normal gait and grip strength, and a negative straight leg raising both seated and supine.  (R. 153.)  Plaintiff had normal sensory, motor and reflex findings and normal repetitive muscle testing of the upper and lower extremities. Consequently, as is the case with the other Listings, there is simply no evidence to support the conclusion that Plaintiff met Listing 1.04.

Plaintiff further argues that the ALJ had a duty to consider the combination of impairments and whether they equal a listed impairment.[46]  In support of this argument, Plaintiff points to Dr. Salzman's testimony in which he states that taken together all of Plaintiff's impairments equal a listing. (R. 468.)  If a claimant has more than one impairment and none of his impairments meet or equal a listed impairment, as is the case here, the ALJ must review the impairments, symptoms, signs, and laboratory findings to determine whether the combination of impairments is medically equal to any listed impairment.

The ALJ did so here. The ALJ expressly stated in her decision that she considered Plaintiff's symptoms of generalized body pain, thoracic and lumbar spine complaints, right sided sacroiliac joint dysfunction, fibromyalgia, chronic fatigue

---

[46] 20 C.F.R. § 404.1526(a).

syndrome, obesity, gastroesophageal reflux disease, peptic ulcer disease, degenerative joint disease, and rhinitis, alone and in combination and concluded that they are severe but are not severe enough to meet or medically equal any of the listed impairments. (R. 239.)  In making this finding, the ALJ reviewed the medical evidence discussed above regarding each of the listings and again reviewed the medical evidence with regard to her evaluation of Plaintiff's RFC.

When deciding medical equivalence, the ALJ must consider the medical opinion of one of more designated physicians on an advisory basis.[47]  However, at this stage of the evaluation process, the burden is on the plaintiff to prove that he or she is disabled and the Plaintiff must present evidence which describes how the impairment has such an equivalency.[48]  The testimony of Dr. Salzman does not meet this standard in view of the fact that Dr. Salzman never even mentioned or discussed the criteria for the Listings nor did he provide any testimony regarding how any of impairments equaled any of the three Listings.

According to Plaintiff, the ALJ ignored the medical expert's testimony and substituted her lay opinion for his.  Although the ALJ did reject the testimony of Dr. Salzman, the ALJ did not ignore it.  As is required, the ALJ considered the testimony of the medical expert and provided reasons for discrediting Dr. Salzman.  As is proper, the ALJ assigned "little weight" to Dr. Slazman's opinion because the opinion was "conclusory," "self-contradictory" and "speculative."  Ultimately it is the responsibility of

---

[47] 20 C.F.R. § 416.926(b).

[48] *See* Bell v. Bowen, 796 F.2d 1350, 1352-1353 (11th Cir. 1986); Wilkinson v. Bowen, 847 F.2d 660, 663 (11th Cir. 1987).

the ALJ to determine medical equivalence and her reasons for discrediting the medical

expert and finding that Plaintiff's impairments do not meet or medically equal Listings

12.07, 1.02 and 1.04. As discussed above the ALJ clearly did so and her findings that

Plaintiff failed to meet or equal the Listings is supported by substantial evidence.

**B.      The ALJ Did Not Violate the Pain Standard By Failing To Credit Plaintiff's Testimony**

Lastly, Plaintiff argues that the ALJ erred by rejecting his credibility regarding his

level of pain. The Court does not agree.

In evaluating a disability, the ALJ must consider all of a claimant's impairments,

including his subjective symptoms, and determine the extent to which the symptoms can

reasonably be accepted as consistent with the objective medical evidence.[49]  Where, as

here, an ALJ decides to discredit a claimant's testimony about subjective complaints

concerning the intensity, persistence and limiting effects of symptoms, the ALJ must

articulate specific and adequate reasons for doing so, or the record must be obvious as

to the credibility finding.[50]  A reviewing court will not disturb a clearly articulated credibility

finding with substantial supporting evidence in the record.[51]  However, a lack of a

sufficiently explicit credibility finding becomes a ground for remand when credibility is

---

[49] 20 C.F.R. § 404.1528.

[50]  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995); Jones v. Dep't. of Health & Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[51] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

critical to the outcome of the case.[52]  If proof of disability is based on subjective evidence

and a credibility determination is, therefore, critical to the decision, the ALJ must either

explicitly discredit such testimony or the implication must be so clear as to amount to a

specific credibility finding.[53]

In her decision, the ALJ stated that after considering the evidence of record, the

ALJ determined that Plaintiff's impairments could reasonably be expected to produce the

alleged symptoms but that Plaintiff's symptoms concerning the intensity, persistence and

limiting effects of these symptoms are not entirely credible. (R. 244.)  In making this

determination, the ALJ considered objective medical evidence, as well as other factors,

such as, evidence of daily activities, the frequency and intensity of pain, any precipitating

and aggravating factors, medication taken and any resulting side effects, and any other

measures taken to alleviate Plaintiff's pain.[54]

Here, the ALJ properly evaluated Plaintiff's testimony and found that he was not

credible in his allegations of disabling pain prior to June 2000.  As required, the ALJ

enumerated the proper standard by which Plaintiff's credibility was to be evaluated and

then provided an appropriate analysis of Plaintiff's allegations. (R. 244.)  In particular, the

ALJ discussed two primary reasons for not accepting Plaintiff's credibility.

First, the ALJ relied upon Dr. Medero's findings in concluding that the medical

---

[52] Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

[53] Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995)(quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (holding that although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

[54] 20 C.F.R. § 404.1529(c)(2), (3); SSR 96-7p.

evidence did not support Plaintiff's allegations with respect to Plaintiff's physical and mental impairments.  Dr. Medero noted in his examination of Plaintiff that Plaintiff had a full range of motion of the cervical and thoracolumbar spines; a normal gait, a negative straight leg raising both seated and supine; normal grip strength and fine manipulations; no deformities, heat, redness, swelling, pain, tenderness, or other signs of inflammation. (R. 151, 153.) Dr. Medero also found during his examination that Plaintiff had normal sensory, motor and reflex findings and normal repetitive muscle testing of the upper and lower extremities.  (R. 151.) These clinical findings do not support the intensity of pain Plaintiff testified he experienced.

Secondly, the ALJ relied upon the opinion of Dr. Shetty, Plaintiff's treating pain specialist, to which he accorded great weight. Because Dr. Shetty was a treating physician it was appropriate that the ALJ accorded more weight to this opinion than the opinion of Dr. Salzman, who was only a medical expert and not a treating source.[55]  In his June 14, 2001, RFC assessment Dr. Shetty found that Plaintiff had the residual functional capacity to perform at least light exertional work activities (R. 203-206), a finding that is inconsistent with Plaintiff's allegations of disabling pain prior to June 2000.

Accordingly, the Court concludes that the ALJ applied the appropriate standard with regard to Plaintiff's allegations of pain and that she provided specific reasons supported by substantial evidence for concluding that Plaintiff's allegations of disabling pain prior to June 2003 were not credible.

## V.  CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the

---

[55] *See,* Phillips v. Barnhart, 357 F.3d 1232 (11th Cir. 2004).

Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly and close the file.

      **IT IS SO ORDERED.**

      **DONE AND ORDERED** in Ocala, Florida, on September 29, 2008.

GARY R. JONES
United States Magistrate Judge

Copies to:
      All Counsel